UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

GINAMARIE T.,

                            Plaintiff,

   v.                                            5:20-CV-1163
                                                              (MAD/ATB)

COMMISSIONER OF THE SOCIAL SECURITY
ADMINISTRATION,

                            Defendant.

---

HOWARD D. OLINSKY, ESQ., for Plaintiff
HUGH DUN RAPPAPORT, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Mae A. D'Agostino, United States District Court Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I. PROCEDURAL HISTORY

On March 8, 2017, plaintiff filed an application for Social Security Disability Insurance benefits ("DIB"), alleging disability beginning November 1, 2015 due to post-traumatic stress disorder ("PTSD"), anxiety, depression, headaches, a skin disorder, back and neck issues, arthritis in both hands, and carpal tunnel syndrome. (Administrative Transcript ("T") at 15, 147). Her claim was denied initially on April 10, 2017. (T. 62). Plaintiff requested a hearing, which was held by videoconference on July 15, 2019 before Administrative Law Judge ("ALJ") Melissa Hammock. (T. 30-61).

Plaintiff appeared without counsel.[1] (T. 33-34). The ALJ heard testimony from the plaintiff, plaintiff's husband, and Vocational Expert ("VE") George Starosta. On September 5, 2019, ALJ Hammock issued an unfavorable decision. (T. 15-25). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on July 20, 2020. (T. 1-5).

## II. GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hire if he applied for work

42 U.S.C. § 1382(a)(3)(B). The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

---

[1] At the hearing, the ALJ questioned plaintiff about her decision to proceed without counsel. (T. 33-34). Plaintiff made the choice to proceed pro se and waived her right to have an attorney assist her. (*Id.*)

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled with-out considering vocational factors such as age, education, and work experience… Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

3

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III. FACTS

Plaintiff was 47 years old on the date last insured ("DLI"). (T. 23, 127). Plaintiff lived in a home with her husband and 22-year old son. (T. 39). She had a high school education, and obtained a cosmetology license. (T. 40, 148). Plaintiff worked as a hair stylist in her own beauty salon. (T. 148). Plaintiff testified that she stopped working after she had a problem with a stalker at the salon. (T. 45-46). Plaintiff testified that the stalker was the owner of another shop in the plaza where she worked. He began coming over for coffee and finally expressed an interest in having an affair with

plaintiff. When she did not reciprocate, he began breaking into the salon, threatened her husband, and ultimately shot a rifle through the wall of her salon. (T. 46). Although plaintiff moved to another salon, she testified that she was still followed by "his" daughter's friends from high school, and "people" would wait for her outside the new salon when she was finished working. (T. 46). Plaintiff stated that this went on for approximately six months. (*Id.*) Ultimately, she developed stress-related sores on her skin and stopped working because she was no longer able to trust anyone, and was unable to be around men. (*Id.*) Plaintiff testified that her PTSD was "really bad," and that she was unable to go to the mall or anywhere in public. She stated that she suffered from panic attacks, which resulted in jitters, sweating, and dry-mouth. (T. 46-47). She testified that she did not go anywhere without her husband. (T. 47). The stress of going out caused plaintiff to break out in sores. (*Id.*)

Plaintiff's husband testified that plaintiff's personality had changed substantially since the stalking incident. (T. 51). He stated that plaintiff did not wish to leave the house, did not feel safe around strange men, and was very depressed. (*Id.*) He testified regarding the stress-induced sores on plaintiff's hands, feet, and face, which healed after she stopped working and calmed down. (*Id.*) He testified that he accompanied plaintiff to the store, and that they went at times when the store was the "least crowded," because plaintiff did not like being around "large groups of people." (*Id.*)

The ALJ also heard testimony from VE Starosta. (T. 54-60). The ALJ asked a hypothetical question, assuming that plaintiff had no exertional limitations, and she had "no past work" to classify. (T. 54). The ALJ asked the VE to assume an individual of plaintiff's age, education, and work experience, who could perform simple, routine

5

tasks, and who could have "occasional, superficial interaction with the public." (T. 54). The VE suggested jobs in both the light and sedentary exertional categories that would fit the ALJ's proposed hypothetical claimant.[2] (T. 54-55). The VE also discussed an employer's tolerances for being "off-task" and absent from work. The VE stated that these tolerances would vary a bit with the employer, particularly because the Dictionary of Occupational Titles ("DOT") does not address workplace behavior or absentee tolerance. (T. 55). Thus, the VE's opinion on this subject was based only on the VE's own knowledge and experience in the field. (*Id.*)

Although there are not many medical records in the administrative transcript, rather than discussing the medical evidence at the outset, I will refer to the pertinent records during my analysis of the plaintiff's arguments.

## IV.   THE ALJ'S DECISION

At step one of the sequential evaluation, the ALJ found that plaintiff last met her insured status on March 31, 2016, and that she had not engaged in substantial gainful activity since November 1, 2015, her alleged onset date. (T. 17). At step two, the ALJ determined that plaintiff had the following severe impairments: lichen planus[3] and post traumatic stress disorder ("PTSD"). (T. 18). The ALJ found that plaintiff was

---

[2] The VE first proposed jobs in the light category, but after questioning by plaintiff regarding her alleged inability to stand for a prolonged period of time, the VE also proposed jobs in the sedentary category that the hypothetical individual could perform. (T. 58).

[3] Lichen planus is a
> condition that can cause swelling and irritation in the skin, hair, nails and mucous membranes. On the skin, lichen planus usually appears as purplish, itchy, flat bumps that develop over several weeks. In the mouth, vagina and other areas covered by a mucous membrane, lichen planus forms lacy white patches, sometimes with painful sores.

https://www.mayoclinic.org/diseases-conditions/lichen-planus/symptoms-causes/syc-20351378.

diagnosed with depression[4] within days of the expiration of her insured status, and with no prior history of the impairment, it did not meet the 12-month duration requirement for a severe impairment. (T. 18). The ALJ found that plaintiff's hypothyroidism was not severe. (T. 18). Finally, the ALJ found that plaintiff's various other physical issues were not medically determinable impairments.[5] (*Id.*)

At step three of the sequential evaluation, the ALJ found that plaintiff's impairments did not meet or equal the severity of a listed impairment. (T. 18-19). The ALJ considered Listing 8.05 in conjunction with plaintiff's lichen planus. (*Id.*) However, the skin conditions in Listing 8.05 required the presence of extensive skin lesions, persisting for at least three months despite treatment. (T. 19). Plaintiff's lichen planus "comes and goes," and was generally controlled with medication on an "as needed" basis. (*Id.*) In analyzing plaintiff's mental impairment, the ALJ considered Listing 12.15 (trauma and stressor-related disorders).

At step four, the ALJ found that, through her date last insured, plaintiff had the RFC to perform a full range of work at all exertional levels. However, plaintiff would only be able to perform simple, routine tasks, having only occasional, superficial interaction with the public. (T. 19). The ALJ determined that although plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the plaintiff's statements regarding the intensity, persistence, and limiting

---

[4] Plaintiff complained of depression to her weight management doctor on March 28, 2016, who referred plaintiff to a psychiatrist. (T. 18, 248).

[5] The ALJ found that there was insufficient objective evidence to corroborate the existence of any of these alleged physical impairments. Plaintiff is not making any arguments relative to these impairments.

effects of the symptoms were not entirely consistent with the medical and other evidence of record. (T. 20-21).

The ALJ ultimately found, based on the above RFC and the testimony of the VE, that, through her date last insured, plaintiff could perform jobs existing in significant numbers in the national economy. (T. 24). Even though the ALJ found that plaintiff could perform work at all exertional levels, the representative jobs were all "light" work. (*Id.*)

## V.     ISSUES IN CONTENTION

Plaintiff raises the following argument in support of her position that the ALJ's decision is not supported by substantial evidence:

1. The ALJ's mental RFC is not supported by substantial evidence because the ALJ failed to properly weigh the opinions of plaintiff's treating mental health providers. (Plaintiff's Brief ("Pl.'s Br.") at 7-18) (Dkt. No. 15).

Defendant argues that the Commissioner's decision is supported by substantial evidence. (Defendant's Brief ("Def.'s Br.") at 3-20) (Dkt. No. 18). For the following reasons, this court agrees with the defendant and will recommend affirming the Commissioner's decision.

## VI.    RFC/Weight of the Evidence

### A.    Legal Standards

#### 1.    RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent

8

work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 2. Weight of the Evidence

In making a disability determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. *See* SSR 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that she applies and the weight that he accords the evidence considered.[6] *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

### B. Analysis

Plaintiff alleged an onset date of November 1, 2015. Her date last insured was March 31, 2016. Thus, plaintiff must establish that she was disabled in the five month period between these dates. *See Morgan v. Saul*, No. 19-CV-5915 (AYS), 2021 WL

---

[6] Before the ALJ issued her decision, the Commissioner published final rules titled "Revisions to Rules Regarding the Evaluation of Medical Evidence." 82 Fed. Reg. 5844 (2017). Some of those rules apply to applications filed before March 27, 2017; others apply to applications filed on or after March 27, 2017. *See, e.g.*, 20 C.F.R. §§ 404.1520c, 404.1527; *see also* Notice of Proposed Rulemaking, 81 Fed. Reg. 62560, 62578 (2016). Plaintiff filed her claim before March 27, 2017, thus, the previous rules apply.

4551937, at *10 (E.D.N.Y. Oct. 5, 2021) (plaintiff must prove that she was disabled prior to her date last insured) (citing inter alia *Vilardi v. Astrue*, 447 Fed. App'x 271 (2d Cir. 2012)). Plaintiff argues that the ALJ did not properly weigh the evidence submitted by her therapist, Vivian E. Nickless-McElligott, LCSW and her psychiatrist, Dr. Miranda Mohabir. Plaintiff argues that the ALJ erred when she stated that she gave only partial weight to Ms. Nickless-McElligott because there was a "lack of diagnosis" and a "lack of abnormal psychiatric findings." (Pl.'s Br. at 10-11). Plaintiff claims that the ALJ mischaracterized the evidence, and lists various symptoms exhibited by plaintiff showing depression, anxiety, and PTSD.

    First, the court notes that plaintiff has miscited the ALJ's opinion. The ALJ stated that "the level of intensity and limiting effects Ms. Nickless-McElligott suggests lack adequate support in the medical records ***from the relevant period***, which contain no diagnosis, no mental health treatment other than medication, and no abnormal psychiatric findings." (T. 22-23). Plaintiff began treating remotely[7] with Ms. Nickless-McElligott shortly after the November 2015[8] salon incident. (T. 281-82). Ms. Nickless-McElligott wrote two letters on plaintiff's behalf, one in April of 2017 and one in September of 2018, discussed further below, both concluding that plaintiff was "unable to work at this time." (*Id.*) There are no contemporaneous treatment records from Ms. Nickless-McElligott.

---

[7] Ms. Nickless-McElligott is licensed to practice social work in New York State and Texas, but is resides and works from her office in Texas. (T. 281-82). Plaintiff testified that she sees her therapist remotely. (T. 43).

[8] One of Ms. Nickless-McElligott's letters states that she began seeing plaintiff in November of 2016, and the other letter states that she began seeing plaintiff in November of 2015. (T. 281-82). It appears that the 2015 date is correct.

11

Under the regulations in effect at the time of plaintiff's application, Ms. Nickless-McElligott was not considered an acceptable medical source. 20 C.F.R. § 404.1502(a). Her opinion must still be properly evaluated by considering the frequency of treatment, consistency with other evidence, degree of supporting evidence, thoroughness of explanation, and whether she has an area of expertise–the same factors as those used for acceptable medical sources. *Michael S. v. Kijakazi*, No. 20-CV-6340, 2021 WL 2917694, at *3 (W.D.N.Y. July 12, 2021) (citing 20 C.F.R. § 416.927(c); *Pike v. Colvin*, No. 14-CV-159, 2015 U.S. Dist. LEXIS 35143 at *11, 2015 WL 1280484, at *5, 8 (W.D.N.Y. Mar. 20, 2015) (quotation and alterations omitted)). "The ALJ 'does not have to explicitly walk through these factors,' so long as the court can conclude that the ALJ 'applied the substance' of the listed factors and provided 'good reasons' for the weight given to the medical source's opinion." *Pike*, 2015 WL 1280484, at *5. (quoting *Hall v. Colvin*, 37 F. Supp. 2d 614, 625 (W.D.N.Y. 2014)).

Contrary to plaintiff's argument, the ALJ specifically stated that she "strongly" considered Ms. Nickless-McElligott's statements, together with the statements by dermatologist, Dr. DeLuca, "especially in light of the claimant's testimony and that of her husband." (T. 22). The ALJ found that plaintiff's PTSD was severe,[9] due to its effect on plaintiff's ability to get along with others, particularly men who she did not

---

[9] In fact, the ALJ discounted the opinion of the non-examining agency expert, Dr. Kamin, Ph.D., who opined in April of 2017, that there was no evidence of a mental disorder at all prior to the DLI. (T. 22) (citing T. 66). The ALJ correctly noted that Dr. Kamin's opinion was based on an incomplete record. Plaintiff submitted evidence submitted "after [Dr. Kamin] reviewed the record, including statements from the claimant's counselor that convincingly demonstrated the claimant had been diagnosed with PTSD due to trauma that occurred in 2015." (T. 22) (citing T. 274-76, 281-83). This statement further supports the fact that the ALJ "strongly" considered Ms. McElligott's opinion letters.

know. (*Id.*) The ALJ found the Lichen Planus severe in combination with the PTSD "because of the exacerbating effects of stress on her skin condition. (*Id.*) However, the ALJ found that there was "too little evidence" from the relevant period to "corroborate the claimant's allegations in this case." (*Id.*) Essentially, the ALJ recognized that plaintiff suffered from severe impairments, but found that the severe impairments did not impose greater or additional limitations that those provided in the ALJ's RFC. (*Id.*)

The ALJ further considered Ms. McElligott's 2017 and 2018 opinions stating that plaintiff was "unable to work at this time." (T. 22-23) (T. 281-82). The ALJ stated that she "gave partial weight to the counselor's opinion insofar as it suggests limitations in adaptive functioning and interacting with others, but [the ALJ] assigned specific limitations in the residual functional capacity commensurate with the overall evidence. [The ALJ] largely disregarded the conclusory portions of the counselor's opinion regarding the claimant's ability to work, as they go to an issue reserved to the Commissioner." (T. 23). Even if Ms. McElligott were an acceptable medical source, the ultimate conclusion that plaintiff was "unable to work"[10] was reserved to the Commissioner and was not an appropriate medical opinion which would have been binding on the ALJ, even under the pre-2017 regulations.

---

[10] The court notes that Ms. McElligott's 2017 letter states more than once that plaintiff was unable to work in "***her field***." (T. 274). The mere suggestion of "haircutting" caused her to have PTSD symptoms which led to the depression that prevented her from leaving her house for extended periods of time. (*Id.*) Therapy had helped, but she was unable to think about "her profession" without an extreme reaction and could not even cut hair for her own family members without PTSD symptoms. (*Id.*) Ms. McElligott's ultimate conclusion that plaintiff could not do any work because of her inability to deal with stress, make decisions, work with people, and control her PTSD symptoms appears to be an extension of her statements regarding plaintiff's own profession. In any event, in the RFC, the ALJ compensated for plaintiff's difficulties with stress, difficulty making decisions, and difficulty working with others.

13

The plaintiff did not begin to see psychiatrist Dr. Mohabir until May 24, 2016, two months after plaintiff's date last insured. (T. 230). Dr. Mohabir's first treatment note indicates that plaintiff was referred by Dr. Wendy Scinta (Medical Weight Loss) because plaintiff had been struggling with depression. (*Id.*) Plaintiff's "current complaint" was listed as "my meds." (*Id.*) Dr. Mohabir stated in the "History" portion of her initial note that another physician had diagnosed Cyclothemia and Bipolar Disorder "18 years ago," and had prescribed medications that plaintiff felt were "not working." (*Id.*) Dr. Mohabir's diagnosis was "MDD recurrent,"[11] and the doctor adjusted plaintiff's medications. (T. 231). On June 28, 2016, Dr. Mohabir discussed plaintiff's medications, noted that plaintiff's irritability was "better," her mood was "anxious," but her affect was full-range. (*Id.*) On September 15, 2016, well after plaintiff's date last insured, Dr. Mohabir still focused her treatment notes on plaintiff's medication management. (T. 232). Plaintiff had to "come off" one medication that was helping because her insurance would not cover it, and plaintiff's depression was worse because plaintiff's husband had decided to leave her a few days prior. (*Id.*)

On March 27, 2018, Dr. Mohabir stated that plaintiff was "down," her affect was "constricted," she was more sensitive, more irritable, and with "more social withdrawal." (T. 256). On April 26, 2019, more than three years after plaintiff's date last insured, Dr. Mohabir stated that plaintiff's anxiety and depression persisted to a significant degree. (T. 255). Dr. Mohabir stated that plaintiff could perform activities of daily living, but could not "consistently" function outside the home. However, "she still forces herself to get things done." (*Id.*) Dr. Mohabir stated that plaintiff did not finish

---

[11] Major Depressive Disorder.

tasks that required concentration for "extended periods of time." (*Id.*) The doctor also stated that "some" PTSD symptoms still come up, which limit the plaintiff's ability to be at the "mall" or any place with "crowds." (*Id.*)

The ALJ specifically stated that Dr. Mohabir's notes, which began in May of 2016, related to a period after the date last insured and were not relevant to the adjudication.[12] (T. 21). The ALJ also correctly stated that this evidence "generally shows long gaps in treatment with reportedly good mood control on psychotropic medications until 2019, when the claimant reported difficulty leaving her home and dealing with crowds." (T. 21) (citing Exhibits 5F/1-2 and 9F/14, 20-25).[13] Plaintiff saw Dr. Mohabir three times in 2016, beginning in May (two months after plaintiff's date last insured), once in June, and once in September. (T. 231-32). Dr. Mohabir's next note is dated in March of ***2018***, and the last progress note is dated April 26, 2019, more than three years after plaintiff's date last insured. (T. 255-56).

In between Dr. Mohabir's notes, as the ALJ noted, were long stretches of time where plaintiff was doing better. Dr. Scinta, plaintiff's weight loss physician, who plaintiff used as her primary care doctor,[14] noted in January of 2017 that plaintiff was feeling well mentally, that Dr. Mohabir had started her on a new medication, and "she feels great." (T. 309). Plaintiff told Dr. Scinta that she was "busy working on a new

---

[12] *See Morgan v. Saul*, 2021 WL 4551937, at *11 (finding that the ALJ correctly accorded no evidentiary weight to questionnaires completed by Dr. Moriarty, indicating severe limitations to plaintiff's ability to work because the evidence was "more than two years after claimant's date last insured.")

[13] The ALJ does not mention Dr. Mohabir by name, but she clearly cited Dr. Mohabir's only treatment notes.

[14] Plaintiff testified that she used Dr. Scinta as her primary care physician. (T. 42).

15

APP for hair color (dye) allergies." (*Id.*)  In June of 2017 plaintiff told Dr. Scinta that she was "kicking ass" with her weight loss program, that her depression medications were "good," and she was "in a very good place." (T. 306).

In September of 2017, Dr. Scinta stated that plaintiff's "life has finally settled down and she is happy." (T. 304).  Plaintiff "loved" the medication that she was taking, but she could not afford it any more, and they discussed switching. (*Id.*)  In October of 2017, Dr. Scinta stated that plaintiff's spirits were "good," and she was feeling well. (T. 303).  Plaintiff did not see Dr. Scinta again until April of 2018. (T. 302).  On May 7, 2018, Dr. Scinta reported that plaintiff "retired" from her hairstylist job after the gunshot, and she spent her time crafting, cleaning, and cooking. (T. 301).  In June, July, and August of 2018, Dr. Scinta stated that plaintiff was doing much better with her depression and mood disorder. (T. 299, 300, 301).  On October 18, 2018, Dr. Scinta reported that plaintiff was feeling "much much" better mentally with the combination of medications she was taking. (T. 297).

The court notes that Ms Nickless-McElligott's September 3, 2018 letter stated that plaintiff could not work "at this time," and that her "current depressive state" was an "extreme exacerbation" of a "genetic history of extremely mild depression." (T. 281).  However, less than a month later, Dr. Scinta (who saw plaintiff in person), stated that plaintiff was feeling much better, an opinion that she reiterated in June, July, and August of 2018. (T. 299, 300, 301).

On February 12, 2016, shortly before plaintiff's date last insured, her dermatologist, Dr. LaDuca, Ph.D., M.D., wrote a letter regarding plaintiff's skin condition, for which there is no cure. (T. 257).  Dr. LaDuca told plaintiff to strongly

16

consider another career choice because her job with its prolonged standing did not help the condition. His recommendation was that she avoid stress and choose a new career. Treatment notes from Dr. LaDuca in both December 2015 and January 2016 reflect that plaintiff denied psychiatric symptoms and that her affect was normal. (Tr. 216, 217, 223).

The ALJ's determination that treatment notes after the DLI generally indicated plaintiff was doing well and that her medications were effective, with the proper management is supported by substantial evidence. (Tr. 19). The RFC established by the ALJ took into account plaintiff's problems with stress by restricting her to performing only simple, routine tasks. (T. 23). The ALJ stated that she took into account the effects of plaintiff's PTSD and her limited ability to work with strangers or be in crowds by finding that she could have only *occasional, superficial interaction with the public*. (*Id.*)

The ALJ found that plaintiff had limitations, during the relevant period, but did not find that the plaintiff's statements regarding the extent of those limitations was consistent with the evidence. The ALJ took all the evidence into consideration, including plaintiff's husband's testimony. Conflicting evidence was for the ALJ to resolve,[15] and her decision was supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and plaintiff's complaint be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file

---

[15] *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).

written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: February 7, 2022

*Andrew T. Baxter*
Andrew T. Baxter
U.S. Magistrate Judge